duplicate

FILED
CLERK, U.S. DISTRICT COURT

MAR 21 2003

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

ENTERED
CLERK, U S DISTRICT COURT

MAR 24 2003

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

Priority _____
Send _____
Enter _____
Closed _____
JS-5/JS-6 _____
JS-2/JS-3 _____
Scan Only _____

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

HARRY DAVID WILLIAMS, et al.,

       Plaintiffs,

    v.

COUNTY OF SANTA BARBARA, et al.

       Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)

CASE NO. CV00-11122 AHM (JWJx) consolidated with CV01-590 AHM (JWJx)

**ORDER RE MOTION OF MEANS ET AL. FOR PARTIAL SUMMARY JUDGMENT AGAINST PLAINTIFF WILLIAMS.**

THIS CONSTITUTES NOTICE OF ENTRY AS REQUIRED BY FRCP, RULE 77(d).

77

**TABLE OF CONTENTS**

I.     INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

II.    FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

       The Investigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

       The Search and Alleged Detention . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

       Retention of Property . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

       Procedural History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

III.   SUMMARY JUDGMENT STANDARD . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

IV.    ANALYSIS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

       1. Unlawful Searches and Seizures by Andalon . . . . . . . . . . . . . . . . . . . . . 11

              (a)    Vintage Currency . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

              (b)    Passport and Answering Machine Tapes . . . . . . . . . . . . . . . . . 19

              (c)    Documents Lying Around the House . . . . . . . . . . . . . . . . . . . 20

              (d)    Trash . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

              (e)    Overheard Conversations . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

              (f)    Summary re Unlawful Searches and Seizures . . . . . . . . . . . . . . 25

       2. The Affidavit and Search Warrant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

              (a)    Money Laundering . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

              (b)    Narcotics . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

              (c)    Probable Cause . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

       3. Detention During Execution of the Warrant . . . . . . . . . . . . . . . . . . . . . . 39

       4. Damage to Williams's Property During Execution of the Warrant . . . . . . . . . 40

       5. Retention of Seized Property After Execution of the Warrant . . . . . . . . . . . . 42

V.     CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

# I.

## INTRODUCTION

Plaintiffs Harry David Williams, Janelle Hopps, Robert Dale Schade and Lia Marie Schade bring this action under 42 U.S.C. § 1983 for violation of their Fourth Amendment rights.[1] Their suit arises from, but is not limited to, a series of search warrants that were executed at over 20 locations, beginning on January 20, 2000. Fourth Amended Complaint ("FAC") ¶ 29. The Defendants are Santa Barbara County ("SB"), the Santa Barbara Sheriff's Department ("SBSD"), James Thomas  (the Sheriff of SB at the time of the acts alleged), James Auchincloss (an SB Deputy District Attorney), and detectives and other employees of SBSD.  The Fourth Amended Complaint also names as defendants an informant named Araceli Andalon and one "Gloria," a person who on occasion helped Andalon in her cleaning duties.[2] Andalon's "handler" Gail Hermreck (an SB probation officer), and Brenton Chinn of the California Department of Justice's Bureau of Narcotics are also named as defendants.

The Fourth Amended Complaint lists 31 plaintiffs and 33 defendants.  This Order addresses the first of eight separately-filed Summary Judgment motions.  This motion, which is directed against the claims of only Plaintiff Williams, was brought by Defendants Means, Palera, Olmstead, Gracey, Dollar, Cintron, Birchim, Swopes (all employees of SBSD), Hermreck and Auchincloss (collectively "SB Defendants").

For the reasons elaborated below, the motion is GRANTED in part, primarily because the moving defendants are entitled to qualified immunity under *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674 (1978), *Branch v. Tunnell*, 937

---

[1] Plaintiffs also include numerous business entities, most of which are owned or controlled by Plaintiff Williams, and which are organized and existing under the laws of foreign countries.  Fourth Amended Complaint ("FAC") ¶ 5.

[2] *Gloria's true name has been ordered not to be filed in the public record.* FAC ¶ 13.

1   F.2d 1382 (9th Cir. 1981) and the other authorities cited below.  In limited

2   respects the motion is also DENIED.

3

4                                         **II.**

5                               **FACTS**

6       Unless otherwise noted, the following facts are not disputed.  (Additional

7   facts affecting Williams's precise claims are incorporated in ensuing sections.)

8   Williams has substantial investments in real estate in the United States and in

9   foreign countries, either directly, or through a number of business entities that he

10   owns or directly controls.  FAC ¶ 18.  He purports to be a "self-employed

11   investor."  *Id.*  Williams moved to the Santa Ynez Valley in SB in late 1995 or

12   early 1996.  *Id.*; Opp. Exh. A (Means Affidavit in Support of Warrant ("Aff't"))

13   at 6.

14                         **The Investigation**

15       In early 1996, Williams hired Defendant Andalon as a non-live in maid.

16   FAC ¶ 20. Unbeknownst to him, Ms. Andalon had served as a narcotics informant

17   for the SBSD.  *Id.*  Andalon had proved a reliable informant in past

18   investigations.  Motion Exh. L. (Palera Depo.) at 27:19-23; Exh. M. (Hermreck

19   Depo.) at 61:1 - 63:1; Exh. Y (Olmstead Depo.) 13:15-25.  When Andalon

20   discovered a collection of 1934 and 1935 Silver Certificates and Federal Reserve

21   Notes in Williams's house in early 1996, FAC ¶ 20; Aff't at 10,[3] she approached

22   SBSD detectives and reported her suspicion that Williams could be involved in

23   narcotics and money laundering activities.  Based on Ms. Andalon's purported

24

---

25       [3] Detective Means (the SBSD detective who prepared the affidavit to

26   support the warrant at issue here) reported that Andalon had informed him that she

27   had found the currency mixed with magazines and other papers in a plastic
     garbage bag in Williams's garage.  Aff't at 10.  Williams contends that the money

28   was in his bedroom closet.  Opp. (Williams Decl.) ¶ 12.

1  observations, in March 1996 the SBSD launched an investigation of Williams, his

2  friends, associates and businesses for possible money laundering and drug

3  trafficking.  FAC ¶ 20; Aff't at 4.  The investigation lasted more than five years,

4  including after the execution of the search warrants in question on January 20,

5  2000.  It was based primarily on periodic reports from Andalon of suspicious

6  activity, SBSD surveillance of Williams, review and analysis of Williams's

7  publicly available financial data, and documents retrieved from Williams's trash

8  and the trash of his bookkeeper, Rachel Gerstein.

9        In September 1999, Detective Means began preparing an affidavit (the

10  "Affidavit") to support search warrants for Williams's house, his businesses and

11  the houses and/or businesses of his associates.  Motion (Means Decl.) ¶ 21.

12  Eventually, the same Affidavit was presented to support each individual warrant,

13  except that the last section in each affidavit described the particular location

14  and/or person to be searched.  SGI ¶ 2.  The Affidavit was reviewed by Gerald

15  Franklin, an SB Deputy District Attorney, and others who had provided

16  information or analysis upon which the Affidavit relied.  In particular, Means

17  read the Affidavit to Andalon and she confirmed each representation attributed to

18  her.  Motion, Means Decl.¶ 23; Hupp S.J. Order at 2.  Ultimately, the Affidavit

19  was presented to SB Superior Court Judge William McLafferty on January 11,

20  2000.  *Id.* ¶¶ 22, 23, 27, 28.  Judge McLafferty approved the warrants on January

21  12, 2000.  Motion Exh. A at 60.

22        The key allegations in the Affidavit that Williams challenges as false,

23  reckless or misleading are summarized in Appendix A.  Appendix B contains the

24  most important of the numerous purported facts that Williams contends were

25  deliberately or recklessly omitted from the Affidavit.

26                    **The Search and Alleged Detention**

27        At approximately 8:30a.m. on January 20, 2000, Defendants Palera,

28  Olmstead (both SBSD officers) and other SBSD officers arrived at the Williams

1    residence to execute the warrant. Reply SGI ¶ 308.[4]  Access to Williams's
2    property is blocked by a gate, which was locked at the time the officers arrived.
3    After attempting unsuccessfully to contact someone in the residence to open the
4    gate, Palera hopped the fence and disabled the gate manually, so that the SBSD
5    vehicles could pass through. Motion (Palera 02 Decl.) ¶ 3. Before the officers
6    entered the residence, Williams arrived in his car. *Id.* An officer approached
7    Williams, patted him down and searched his car. Reply SGI ¶ 307. It is
8    undisputed that Williams was never told he was under arrest and that Williams
9    was never handcuffed during execution of the search warrant. Reply SGI ¶¶ 203,
10   205. However, Williams contends that the officer who patted him down told him
11   "not to go anywhere [or] do anything." Opp. Exh. G at 63:6-9 (Williams Depo.).
12        Defendants dispute this account. Palera contends that "[a]t no time during
13   the execution of the search warrant was Williams told he was being detained."
14   Motion (Palera 01 Decl.) ¶ 4. Palera also contends that during the execution of
15   the search warrant Williams was told several times that he was free to leave the
16   residence. *Id.* ¶ 5. Palera says it was Williams's own choice to remain at the
17   house during the entire search, which did not conclude until about 6:00p.m. *Id.*;
18   Reply SGI ¶ 308.
19        While at the residence during execution of the warrant, Williams was
20   allowed to make and receive phone calls, had access to food and water and was
21   permitted to walk around, provided he was escorted by SBSD personnel. Reply
22   (Palera 03 Decl.) ¶¶ 2, 6.
23        During the search, Williams apparently consented to a lengthy tape-
24
25
26   _____
        [4] Nothing in Palera's Declaration – in which he states that the search "was
27   very time-consuming" and "lasted a number of hours" – contradicts Williams's
     assertion that the search lasted from 8:30a.m. to 6:00p.m. Reply (Palera Decl.) ¶¶
28   5, 7.

1  recorded interview conducted in his dining room.[5]  The interview was conducted
2  by Palera and Olmstead.  Defendant Chinn was present part of the time.  Reply
3  (Palera 03 Decl.) ¶ 3.  Palera says that at many points during the interview,
4  Williams and/or the interviewers took breaks to go to the restroom, get water,
5  walk around, etc.  *Id.* ¶ 9.

6       The SBSD officers seized a large number of documents and other items.
7  Defendant Means was at all times the custodian of the items seized.  SGI ¶ 217.

8       After the search was completed, Palera and Williams went through the
9  residence to note any damage that may have occurred.  Reply SGI ¶ 210.
10  Williams did not report any damage at that time.  Motion (Palera Decl.) ¶ 6.
11  Williams says he was so upset by what had occurred that he wasn't paying close
12  attention during the inspection.  Opp. Exh. G at 83:10-11 (Williams Depo.).  As
13  the officers were driving away, one of them backed into a terra cotta pot.
14  Williams was told to file a claim with the County to recover for the damage.
15  Motion (Palera Decl.) ¶ 8.  Williams later discovered between $500 and $1,000
16  worth of damage to his front gate, that his copy machine was damaged and had to
17  be replaced, and that the officers had caused "a couple hundred bucks" worth of
18  damage to the light in his sub-zero refrigerator.  Opp. Exh. G at 76:18-83:9
19  (Williams Depo.).  Williams also discovered that the door to his Ferrari had been
20  left open "just a crack" such that the battery was drained and had to be replaced.
21  *Id.* at 82:9-83:12.  Williams also alleges that the officers  had manifested a
22  "general disrespect" for his property during the search.  Motion Exh. K at 90:8-17
23  (Williams Depo.).  He says they left a bed overturned, clothes on the floor,
24  Christmas ornaments "all over the place" and the contents of cabinets and
25  drawers removed.  *Id.* at 89:11-91:21.

26
27  _____
28       [5] Palera does not say how long the interview was.  However, the transcript
of the interview is at least 224 pages long.  Reply (Palera 03 Decl.) ¶ 3.

## Retention of Property

On August 10, 2000, Williams filed a "Motion for Return of Property" in Santa Barbara Superior Court for return of the property seized from his residence and from the other locations searched pursuant to the same investigation. In addition, Williams requested that the Affidavit upon which the search warrants were based be unsealed. SGI ¶ 221. Before that time, Means had provided Williams with copies of a few of the documents seized and had returned Williams's passport. SGI ¶¶ 218, 220. On August 17, 2000, the court denied Williams's motion, noting that the investigation was "on-going and return would seem premature." Motion Exh. BB at 1184 (Minute Order). The court also stated that Williams could "follow up on the DA's offer to let him see and copy the documents." *Id.* Thereafter, Williams contacted Means and between September 21, 2000 and November 27, 2000 Williams had some of the documents copied. SGI ¶ 225. On October 7, 2000 and November 27, 2000, Means also released various computers and related items to Williams. SGI ¶ 226.

On or about April 6, 2001, the SB District Attorney declined to prosecute Williams. SGI ¶ 227. At the end of June 2001, Means contacted Williams's attorneys and advised them that property seized from his residence was available for release. Williams's representatives picked the items up on August 2, 2001. SGI ¶ 233.

## Procedural History

On October 18, 2000, Plaintiffs filed this suit. The operative pleading (the Fourth Amended Complaint filed on August 30, 2002) alleges that all the Defendants violated Plaintiffs' Fourth and Fourteenth Amendment rights by (a) Andalon and Gloria conducting unlawful searches and seizures at Williams's home; (b) securing and executing invalid search warrants for Plaintiffs' homes, businesses and property; (c) executing the search warrants in an unreasonable manner; (d) wrongfully arresting and/or detaining the individual plaintiffs; and

1    (e) unreasonably searching, seizing, holding and failing to release Plaintiffs'

2    property without legal authority to do so.  FAC ¶ 45.  The analytical and practical

3    difficulties of understanding which plaintiffs assert what claims against which

4    defendants have proven vexing.

5         On October 29, 2001, Plaintiff Williams moved for Partial Summary

6    Judgment to declare the search warrant invalid.  Judge Hupp denied the motion.

7    He held that the warrant showed "probable cause to believe that money

8    laundering existed," that the warrant was not too general in its description of the

9    items to be seized and that there remain triable issues of fact regarding whether

10   false information was recklessly or deliberately included in the warrant affidavit.

11   12/10/01 Order at 2-3.  Judge Hupp did not address issues of qualified immunity.

12   *Id.* at 3.

13        The SB Defendants now move for Partial Summary Judgment regarding

14   Plaintiff Williams's claims, arguing that (1) Williams had no expectation of

15   privacy regarding the documents Andalon read or removed from his residence

16   and the conversations Andalon overheard; (2) the SB Defendants are entitled to

17   qualified immunity regarding the Affidavit supporting the warrant; (3) Williams

18   was not unlawfully detained during execution of the warrant; (4) any damage to

19   Williams's property during execution of the warrant was not a constitutional

20   violation and (5) the SBSD's retention of the seized property was reasonable.

21   The Court addresses each argument below, but before doing so it is necessary to

22   explain the relationship between Williams's first and second claims, insofar as

23   they trigger the defense of qualified immunity.

24        Williams's first constitutional claim purports to be directed not at the

25   Defendants' alleged culpability for wrongfully procuring a search warrant (and

26   the impact of its execution) but at the preceding (or, if contemporaneous with the

27   SBSD investigation, the arguably separate) conduct of Andalon and Gloria.  It is

28   appropriate to analyze this claim first because if (and to the extent) the Affidavit

9

1   was dependent on or incorporated Andalon's and/or Gloria's allegedly

2   unconstitutional conduct, the qualified immunity of Defendants as to the warrant

3   could be affected. The question would be whether (and, if so, to what extent) the

4   Affidavit depended on or incorporated information derived from the assertedly

5   illegal conduct of Andalon and Gloria. *See Murray v. United States*, 487 U.S.

6   533, 542, 108 S.Ct. 2529, 2536 (1988); *United States v. Mulder*, 889 F.2d 239,

7   242 (9th Cir. 1989).

8

9                                  **III.**

10                  **SUMMARY JUDGMENT STANDARD**

11       Federal Rule of Civil Procedure 56(c) provides for summary judgment

12   when "the pleadings, depositions, answers to interrogatories, and admissions on

13   file, together with the affidavits, if any, show that there is no genuine issue as to

14   any material fact and that the moving party is entitled to judgment as a matter of

15   law." The moving party bears the initial burden of demonstrating the absence of

16   a "genuine issue of material fact for trial." *Anderson v. Liberty Lobby, Inc.*, 477

17   U.S. 242, 256 (1986). A fact is material if it could affect the outcome of the suit

18   under the governing substantive law. *Id.* at 248. The burden then shifts to the

19   nonmoving party to establish, beyond the pleadings, that there is a genuine issue

20   for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

21       When the non-moving party bears the burden of proving the claim or

22   defense, the moving party can meet its burden by pointing out the absence of

23   evidence from the non-moving party. The moving party need not disprove the

24   other party's case. *See id.* at 325. Thus, "[s]ummary judgment for a defendant is

25   appropriate when the plaintiff 'fails to make a showing sufficient to establish the

26   existence of an element essential to [his] case, and on which [he] will bear the

27   burden of proof at trial.'" *Cleveland v. Policy Management Sys. Corp.*, 526 U.S.

28   795, 805-06 (1999) (*citing Celotex*, 477 U.S. at 322).

When the moving party meets its burden, the "adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ.P. 56(e).  Summary judgment will be entered against the non-moving party if that party does not present such specific facts.  *Id.*  Only admissible evidence may be considered in deciding a motion for summary judgment.  *Id.*;  *Beyene v. Coleman Sec. Serv., Inc.*, 854 F.2d 1179, 1181 (9th Cir.1988).

"[I]n ruling on a motion for summary judgment, the nonmoving party's evidence 'is to be believed, and all justifiable inferences are to be drawn in [that party's] favor.'" *Hunt v. Cromartie*, 526 U.S. 541, 552 (1999) (quoting *Anderson*, 477 U.S. at 255).  But the non-moving party must come forward with more than "the mere existence of a scintilla of evidence." *Anderson*, 477 U.S. at 252. Thus, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).

# IV.

## ANALYSIS

### 1. Unlawful Searches and Seizures by Andalon

The SBSD Defendants[6] have argued that they are entitled to qualified immunity regarding the documents Andalon read, the conversations she overheard, and her surreptitious removal of items and documents from Williams's

---

[6] Williams is asserting that of the SBSD Defendants who brought this motion, only Defendants Means, Palera, Hermreck, Gracey, Cintron, Birchim and Swopes are liable for the searches and seizures engaged in by Andalon.  Williams has not asserted this claim against Olmstead, Dollar or Auchincloss.  2/14/03 Index of Plaintiffs' Claims No. 2.

11

house and trash (which she delivered to SBSD detectives or Hermreck). They further contend that Williams has no standing to challenge Andalon's intrusions because the items were obtained and/or overheard in the course of Andalon's employment.[7]

Public officials are "shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727 (1982). This is the doctrine of qualified immunity, which, where applicable, is "an entitlement not to stand trial or face the other burdens of litigation." *Mitchell v. Forsythe,* 472 U.S. 511, 526,105 S.Ct. 2806 (1985). If the asserted constitutional right was not clear, the officials cannot be liable.

In *Saucier v. Katz*, 533 U.S. 194 (2001), the Supreme Court stated that in ruling on a summary judgment motion based on qualified immunity, the court must conduct a two-step inquiry. First, the Court must ask: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Id.* at 201. Second, "if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established" when viewed in the context of the case. *Id.* Although it is defendants who interpose the defense or privilege of qualified immunity, the plaintiff has the burden of proof on these two elements. *See Jeffers v. Gomez*, 267 F.3d 895, 916 (9th Cir. 2001); *Bernstein v. Lopez*, ___ F.3d ___, 2003 WL 72814 at *1 (9th Cir. March 4, 2003).

---

[7] The SBSD Defendants do not argue that Andalon was not functioning as their agent when she took items or overheard conversations that she subsequently reported to the SBSD. Given that Hermreck, Andalon's "handler," "ha[d] contact with [Andalon] on a daily basis" during the four year investigation, Aff't at 9, it is not surprising that Defendants do not make this argument.

1   For a right to be "clearly established," "the contours of the right must be

2   sufficiently clear that a reasonable official would understand that what he is doing

3   violates that right." *Saucier*, 533 U.S. at 202 (citation deleted). Supreme Court

4   and Ninth Circuit decisions make clear that the "clearly established" inquiry must

5   be undertaken in a context-specific manner. *Id.*; *Brewster v. Board of Education*

6   *of the Lynwood Unified School District*, 149 F. 3d 971, 978 (9th Cir. 1998).

7   Thus, "[i]n assessing claims of qualified immunity, reviewing courts must not

8   view constitutional rights in the abstract but rather 'in a more particularized, and

9   hence more relevant, sense.'" *Brewster*, 149 F.3d at 978 (*quoting Anderson v.*

10  *Creighton*, 483 U.S. 635, 640 (1987)). "If officers of reasonable competence

11  could disagree on the issue [whether a chosen course of action is constitutional],

12  immunity should be recognized." *Brewster*, 149 F. 3d at 977 (*quoting Malley v.*

13  *Briggs*, 475 U.S. 335, 341, 106 S. Ct. 1092 (1986)). Put more simply, "[i]f the

14  law did not put the officer on notice that his conduct would be clearly unlawful,

15  summary judgment based on qualified immunity is appropriate." *Saucier*, 533

16  U.S. at 202.

17  It is clear that "searches conducted outside the judicial process, without

18  prior approval by a judge or magistrate, are per se unreasonable under the Fourth

19  Amendment – subject only to a few specifically established and well-delineated

20  exceptions." *Katz v. U.S*, 389 U.S. 347, 357 (1967). Because a warrantless

21  search or seizure carried out in a private residence is "presumptively

22  unreasonable," *Murdock v. Stout*, 54 F.3d 1437, 1440 (9th Cir. 1995),

23  Defendants carry the burden of establishing that Andalon's actions fall within one

24  of those "well-delineated" exceptions. *Id.*

25  "[T]he application of the Fourth Amendment depends on whether the

26  person invoking its protection can claim a justifiable, a reasonable, or a legitimate

27  expectation of privacy that has been invaded by government action." *Smith v.*

28  *Maryland*, 442 U.S. 735, 740 (1979) (internal quotations and citations omitted).

13

1  This inquiry normally embraces two questions.  The first is whether the individual

2  has "exhibited an actual (subjective) expectation of privacy," *Katz v. United*

3  *States*, supra, 389 U.S. at 361 (1967) (Harlan, J. concurring).  The second

4  question is whether the individual's "expectation, viewed objectively, is

5  justifiable under the circumstances." *Id.* at 353 (majority op.).

6        The items Andalon is alleged to have read or removed from Williams's

7  residence and the conversations she is alleged to have overheard there are

8  summarized in Appendix C.  The specific items Andalon is alleged to have read

9  or removed include vintage currency, Williams's passport, two microcassette

10 tapes apparently used to record material on Williams's answering machine and

11 papers placed in the trash.  Construing the facts in a light most favorable to

12 Williams, *Saucier*, 533 U.S. at 201, the Court concludes that some of these

13 intrusions violated Williams's clearly established Fourth Amendment rights.

14       There is no question that in general Williams expected that the items in his

15 house and the conversations he carried out there would remain private.  Williams

16 has declared that "Ms. Andalon's job was . . . not to fish documents out of [the

17 trash].  Moreover, Ms. Andalon was not supposed to read documents in my house

18 and I never intended or expected that she would do that."  Opp. (Williams Decl.)

19 ¶ 15.  Williams also declares that he "at all times expected that [his] conversations

20 would be private." *Id.* ¶ 16.  Thus, the issue is whether Williams's claimed

21 expectations of privacy were objectively reasonable.

22       Defendants argue that Williams had no reasonable expectation of privacy

23 regarding the items in question, because in employing Andalon as his

24 housekeeper, he waived his privacy rights regarding items and conversations she

25 might encounter in the scope of her employment.  Defendants argue further that

26 when Williams gave Andalon a key, the security codes for the residence and

27 access to all rooms in the house, all items she encountered there were within the

28 scope of her employment.

1    The Fourth Amendment does not protect Williams from "misplaced
2 confidence in his associates." *United States v. Hoffa*, 385 U.S. 293, 307 (1966).
3 Thus, Andalon's failure to inform Williams that she was a police informant was
4 not a constitutional violation. *United States v. Baldwin*, 621 F.2d 251, 252 (6th
5 Cir. 1980). Moreover, Defendants are correct that what an employee observes in
6 the course of her "daily functions" is "undoubtedly beyond the employer's
7 reasonable expectation of privacy." *Marshall v. Barlows, Inc.*, 436 U.S. 307, 315
8 (1978). Additionally, an employer has no expectation of privacy in items he
9 provides to his employee to enable her to do her job. An analogous example is
10 that if a person provides documents to a financial advisor, he has relinquished any
11 reasonable expectation of privacy in those documents. *Wang v. United States*,
12 947 F.2d 1400, 1403 (9th Cir. 1991). Similarly, an owner of a clinic has no
13 reasonable expectation of privacy in pharmaceutical prescriptions that "come
14 within the daily observation" of a pharmacist in his employ. *United States v.*
15 *Zipperstein*, 601 F.2d 281, 289 (7th Cir. 1979). And a lawyer who gives his legal
16 secretary daily access to his computer system and makes her responsible for
17 "creating, producing and preserving legal documents" has no expectation of
18 privacy in the directory and file names stored on that computer. *United States v.*
19 *Longo*, 70 F.Supp.2d 225, 256-57 (W.D.N.Y. 1999).
20    However, an employer does not relinquish his expectation of privacy in
21 items that are not related to his employee's duties. *United States v. Miller*, 800
22 F.2d 129, 134 (7th Cir. 1986). In particular, "[p]ossession of a key in order to
23 clean the room does not give the possessor the authority to 'use' the premises or
24 documents for any other purpose." *Id*. Thus, that Andalon had keys to
25 Williams's residence and access to all rooms does not render everything she read
26 and seized beyond Williams's expectation of privacy. Moreover, while Andalon
27 could report to the police things she saw in Williams's residence in the course of
28 her employment, *Marshall*, 436 U.S. at 315, she was not entitled to seize an item

15

1    in the house merely because she had access to it. *Miller*, 800 F.2d at 134.

2    Accordingly, for the items Andalon told SBSD detectives about but did not seize,

3    the inquiry is whether she would reasonably be expected to come in contact with

4    those items in the normal course of her duties as Williams's housekeeper. For the

5    items Andalon actually seized, the question is whether she was provided with

6    those items to enable her to do her job.

7         The Court now will turn to each of the items Williams claims Andalon

8    improperly searched or seized.

9         **(a)   Vintage Currency**

10        Andalon claims she found "suspicious" currency in a garbage bag in

11   Williams's garage while putting Williams's property away and that Williams later

12   paid his employees (including her) with that currency. Aff't at 10-11. She says

13   she showed the currency with which Williams paid her to SBSD detectives. *Id.*

14   Thus, by Andalon's account, no search or seizure took place regarding the

15   currency, since she discovered it in the course of her employment and Williams

16   gave her the money she ultimately showed to the police. Detective Means

17   determined that the currency consisted of Silver Certificates and Federal Reserve

18   Notes issued by the U.S. Treasury in 1934 and 1935 and reported Andalon's

19   account of its discovery in the Affidavit. Aff't at 10-11.

20        Williams's account conflicts in some respects. Consistent with Means's

21   determination, he affirms  that the "suspicious" currency was from the 1930s and

22   says it came from a currency collection which he had received as a gift from his

23   father. Opp. (Williams Decl.) ¶ 12. However, Williams  asserts that he stored the

24   collection in his bedroom closet, that he never paid any of his employees with it

25   and that he never gave Andalon any money from that collection. *Id.* The

26   currency Andalon showed SBSD detectives, Williams maintains, must have been

27   taken without Williams's permission.

28        In short, there is genuine factual dispute about issues that are material to

16

1  determining whether what Andalon did violated Williams's Fourth Amendment

2  rights: where was the currency found and how did Andalon come to know about

3  and possess it?  Williams's privacy interests vary depending on how those

4  questions are answered.  Ordinarily, such factual conflicts would preclude

5  granting summary judgment to either side.  But in § 1983 cases where defendants

6  are invoking the doctrine of qualified immunity, the Court must assume the facts

7  in the injured party's's favor and then determine whether it would be clear to a

8  reasonable officer that his conduct was unlawful.  *Estate of Ford v. Ramirez-*

9  *Palmer*, 301 F.3d 1043, 1045 (9th Cir. 2002).  Thus, the Court must and will

10  assume that the currency was stored in Williams's closet and that the money

11  Andalon delivered to Means was taken without Williams's permission.  Even

12  under these assumptions, however, Means would be entitled to qualified

13  immunity for receiving the currency and incorporating information about it in the

14  Affidavit if it was reasonable for him to have believed that Andalon's seizure of

15  that currency was permitted by the Fourth Amendment.

16       Assuming that Andalon's job included rearranging and moving items she

17  found in Williams's closet in order to clean it, this is not like the case in which a

18  person provides a financial advisor with his financial papers, *Wang*, 947 F.2d at

19  1403, or a clinic employer gives a pharmacist in his employ access to prescription

20  records.  *Zipperstein*, 601 F.2d 289.  Andalon's employment duties may have

21  entailed the discovery of the currency collection in the course of cleaning the

22  bedroom closet, so she was entitled to disclose that discovery to the SBSD.  But

23  she was not entitled to seize samples of the collection for Means to examine,

24  because she was never given sufficient control over the collection to entitle her to

25  remove it from the premises.  In short, Andalon's alleged seizure of samples of

26  the currency constituted a warrantless seizure.

27       However, a warrantless seizure is not unconstitutional if Defendants can

28  show that a "well-delineated" exception – such as the "plain view" exception –

17

1    applies. *Katz,* 389 U.S. at 357. The plain view doctrine holds that officers (or

2    their agents) may seize an item without a warrant if "[1] they are in a lawful

3    position to view the item, [2] the item reasonably appears to be contraband and

4    [3] the discovery of the item is inadvertent." *Perkins v. West Covina,* 113 F.3d

5    1004, 1008 (9th Cir. 1997). For an item to "reasonably appear to be contraband,"

6    the officer or agent "must have probable cause to believe there is a nexus between

7    the seized items and criminal activity." *Id.* at 1009. *See also Arizona v. Hicks,*

8    480 U.S. 321, 326 (1987) (probable cause is required to invoke the "plain view"

9    doctrine).[8]

10          There is no genuine dispute here that even assuming Andalon discovered

11   the currency collection in the bedroom closet, she did so inadvertently and in the

12   course of her cleaning duties.   So requirements [1] and [3] of the "plain view"

13   doctrine are satisfied. As to the second element of the plain view doctrine – was

14   the currency apparently contraband? – Defendants have shown that a reasonable

15   officer would have believed Andalon had probable cause to believe that the

16   currency was related to criminal activity. First, Andalon suspected that the money

17   was "fictitious" or "counterfeit" based on its unusual texture and appearance.

18   Aff't at 10-11. Means's subsequent analysis of the currency, which Williams's

19   own account confirms, is that what Andalon found was indeed extremely old

20   currency; it was printed more than 60 years previously, in 1934 or 1935. Aff't at

21   11; Opp. (Williams Decl.) ¶ 12. Next, even according to Williams, the face value

22   of the money he kept in his closet was around $10,000. *Id.* ¶ 13. Given

23   Andalon's reasonable suspicions that the money was counterfeit and that a

24   bedroom closet is an unusual place to store a stack of $10,000 in suspect

25   currency, both Andalon and Means could reasonably rely on the plain view

26   _____

27          [8] Similar to the "plain view" doctrine is the "plain touch" doctrine which
     permits someone who detects contraband through his or her sense of touch (e.g.
28   during a patdown search) to seize it. *Minnesota v. Dickerson,* 508 U.S. 366, 371,
     375 (1993).

doctrine to believe that their conduct did not violate Williams's constitutional right of privacy.   Accordingly, the SBSD Defendants are entitled to qualified immunity regarding the currency Andalon allegedly seized from Williams's residence.

### (b)    Passport and Answering Machine Tapes

Andalon's seizure of both of these items can be analyzed together.[9] Andalon apparently took Williams's passport and answering machine tapes from Williams's residence and delivered them to SBSD detectives.  After an SBSD detective made a photocopy of the passport, which was placed in the case file, Andalon was instructed to return it.  Opp. Exh. B. at 145:11 to 146:12 (Means Depo).  The SBSD retained the answering machine tapes.  Opp. Exh. B at 147:10 to 148:7 (Means Depo.).

As with the vintage currency described above, Williams did not provide the passport or tapes to Andalon in order to enable her to do her job.  Thus, Williams cannot be said to have given Andalon sufficient control over those items to permit her to remove them from the premises and turn them over to the SBSD. Additionally, and unlike the currency, a reasonable officer would have known that Andalon's warrantless seizure of those items was not supported by the "plain view" doctrine or any other exception to the clearly established requirement of a warrant.  While Andalon legitimately could have come across these items in the course of her employment, they were not contraband and her duties did not entitle her to flip through and remove the passport or listen to and remove the tapes. Thus, the SBSD Defendants may neither invoke the doctrine of qualified immunity as to these items nor prevail on their contention that there was no

---

[9] Although Andalon claims she found the tapes in the trash, Reply Exh. QQ at 228:12-15, Means merely states that the tapes were taken from Williams's house.  Opp. Exh. B at 147:16-20 (Means Decl.).  Construing the facts in a light most favorable to Williams, the Court will assume that the tapes were not taken from the trash.

1 violation of the Fourth Amendment because the items were found in the trash;

2 that is a factual dispute.[10]

3       **(c)    Documents Lying Around the House**

4       To clean shelves, drawers and other surfaces in the house, Andalon

5 occasionally was required to move papers, magazines and other documents that

6 had been left lying around.  Andalon's deposition testimony, construed in a light

7 most favorable to Williams, indicates that she read some of those documents and

8 reported on the contents of "suspicious" ones to Gail Hermreck. Williams

9 contends that Andalon's actions exceeded the scope of what she had been

10 authorized to do, thus constituting an impermissible search.

11       The following analysis is unavoidably academic, because the parties have

12 utterly failed to specify the kinds (much less the precise identification) of

13 documents whose search and seizure Williams challenges.[11]

14       While Andalon might reasonably have been expected to glance at

15

---

16     [10] The "Index of Plaintiffs' Claims" filed on February 14, 2003 does not

17 illuminate how and whether Defendants Means, Palera, Hermreck, Gracey, Cintron, Birchim or Swopes were involved with Andalon's seizure of the tapes

18 and passport.  Accordingly, the Court cannot determine which of those Defendants

19 might be liable for that seizure.

20     [11] The only relevant testimony is as follows:

21 Q:  Did you sometimes read documents at Mr. Williams's residence when he wasn't there?

22 A:  To put them out outside of the drawers or inside of the drawers when he

23 left them like that.  But when I cleaned, because I had to clean the shelves and then put everything back.

24 Q:  So would you read the documents when you did that?

25 A:  Well, papers, trash or magazines or –

26 Q:  Did you sometimes report to Gail [Hermreck] something you had read in a paper at Mr. Williams's residence?

27 A:  Yes.

28 Q:  How would you decide which papers you wanted to tell her about?
A:  Papers that I thought they were suspicious.
Motion Exh. I at 107:1-17 (Andalon Depo.).

1   documents to determine where they belonged or whether they ought to be thrown

2   away, she was never expected to study the contents of those documents. Opp.

3   (Williams Decl.) ¶ 15. Here, too, her responsibilities *vis-à-vis* documents were

4   markedly different from the financial advisor's responsibility in *Wang*, 947 F.2d

5   at 1403, the pharmacist's exposure to pharmaceutical records in *Zipperstein*, 601

6   F.2d 289, and the legal secretary's exposure to a computer containing files she

7   was responsible for "creating, producing and preserving" in *United States v.*

8   *Longo*, 70 F.Supp.2d 225, 256-57 (W.D.N.Y. 1999). Although neither side has

9   cited any case precisely delineating the scope of the daily responsibilities of a

10  houseworker, a reasonable officer should have known that it was beyond the

11  scope of Andalon's responsibilities to read documents not addressed to her or not

12  about her work (as advertisements for cleaning supplies would have been) or not

13  about her legal status or duties (as communications from the Franchise Tax Board

14  or, if she was not a citizen, articles about the Immigration and Naturalization

15  Service would have been).[12]

16          Thus, at the time of Andalon's actions it was clearly established that to the

17  extent she examined documents lying around the house not about her and beyond

18  what was necessary to carry out her authorized cleaning functions – such as by

19  reading a multi-page document – that would constitute a warrantless search. The

20  Supreme Court has further held that moving such an object "even a few inches" to

21  inspect it further can constitute a search where doing so is "unrelated to the

22  objectives of the authorized intrusion [and it] expose[s] to view concealed" items

23  or information. *Arizona v. Hicks*, 480 U.S. 321, 325 (1987) (holding that moving

24  a stereo to expose its serial number constituted an independent search for which

25  probable cause was required).

26

27

28

[12] Similarly, to do her job, Andalon did not need to hold an envelope up to the light to discern what was inside. Williams proffers evidence that Andalon did this on one occasion. Opp. Exh. B at 157:16-22 (Means Depo.); Reply SGI ¶ 304.

1    But here the record does not reveal what Andalon read nor whether she
2    physically removed whatever she read from where she found it. Thus, Williams
3    has not established that there was a search that was illegal. Given that Williams
4    has not demonstrated that the SBSD Defendants violated a constitutional right,
5    they are entitled to qualified immunity as to this claim.[13]

6    **(d)    Trash**

7    During the early course of the investigation, Andalon removed documents
8    from Williams's trash, Reply SGI ¶ 305, and gave them to SBSD detectives.
9    Opp. Exh. B at 145:6-10 (Means Depo.). The SBSD detectives sealed the
10   documents in manilla envelopes and catalogued them. *Id.* at 149:4-150:6. Means
11   says he did not closely examine those documents and did not rely on them in
12   drafting the Affidavit. *Id.* On or about January 6, 1999, the SBSD Defendants
13   told Andalon to stop taking trash from Williams's residence. SGI ¶ 305. The
14   issue is whether Andalon's seizure – and the SBSD's acceptance – of Williams's
15   trash during the investigation violated the Fourth Amendment.

16   Defendants do not claim that it was part of Andalon's duties to search
17   through the trash while it was still on Williams's private property. But the parties
18   do dispute whether Williams ever asked Andalon to remove the trash from the
19   property. According to Williams, Andalon's responsibilities included emptying
20   the trash receptacles in the house into trash bins beside the house. It was the job
21   of Williams's gardeners to remove the trash from the premises, Motion Exh. J at
22   240:21-241:20 (Williams Depo.); Opp. (Williams Decl. ¶ 15) and he never asked
23   Andalon to do so. *Id.* Andalon claims that Williams told her to take the trash off
24   the property when it became clear that the gardeners were not doing their job.
25   Reply Exh. QQ at 93:2-23 (Andalon Depo.). As noted above, the Court takes

26

27

28   [13] Once again, the "Index of Plaintiffs'" claims does not aid the Court in determining which of the SBSD Defendants, other than Hermreck and Means, learned about what Andalon read.

22

1   Williams's allegations as true in ruling on the qualified immunity issue. *Estate of*

2   *Ford*, 301 F.3d at 1045.

3        The record does not establish where the trash turned over to the detectives

4   came from – inside the house or from the bins adjoining the house.  In any event,

5   Defendants do not claim that those bins were kept beyond the curtilage.  The

6   Court therefore holds that the SBSD Defendants are not entitled to qualified

7   immunity on this question, because the law was settled that Williams had a

8   reasonable expectation of privacy in the trash so long as it remained on his

9   premises and was not accessible by members of the public. *California v.*

10   *Greenwood*, 486 U.S. 35, 37 (1988), held that a person has no expectation of

11   privacy in trash he leaves for collection outside the curtilage of his home. *Id.* at

12   41.  There, the garbage bags were left on the curb in front of defendant's house,

13   in opaque plastic bags.  Because garbage on a curb is readily accessible to

14   "animals, children, scavengers, snoops and other members of the public," *id.* at

15   40, the owner of the garbage can have no such expectation. *See United States v.*

16   *Bowman*, 215 F.3d 951, 963 (9th Cir. 2000).

17        Here, unlike in *Greenwood*, Andalon's job was not to take the trash to the

18   curb, but to place it in trash bins located on Williams's property.  It was the

19   gardeners who were supposed to dispose of it.  Thus, Andalon never caused

20   Williams's trash to be exposed to the public, but merely transferred it from one

21   part of Williams's private property to another.  Williams undoubtedly intended to

22   have the trash hauled away.  But at the time of Andalon's acts, the garbage had

23   not yet been placed at the disposal of trash haulers or of anyone else.  He still had

24   a reasonable expectation of privacy.  Indeed, what person has not had occasion to

25   scour through his own trash bins in search of something personal that he had

26   inadvertently placed in the garbage?  Defendants are not entitled to qualified

27   immunity.

28       **(e)**   **Overheard Conversations**

23

1   Williams contends that his Fourth Amendment rights were violated when
2   Andalon allegedly "went out of her way" to overhear Williams's conversations
3   cleaning Williams's house. Opp. at 23. Construing the facts in Williams's favor,
4   however, the Court finds that Williams had no expectation of privacy in those
5   conversations.

6       In *United States v. Hoffa*, supra, the Supreme Court held that a person has
7   no reasonable expectation of privacy in conversations "directed to [an informant]
8   or knowingly carried on in his presence." 385 U.S. at 302 (statements made in a
9   hotel room regarding attempts to bribe jurors). The Court noted that Hoffa was
10  not relying on the security of his hotel room when he made the statements, but on
11  "his misplaced confidence that the informer would not reveal his wrongdoing."
12  *Id.* The Ninth Circuit has noted that this "invited informer" exception does not
13  apply if the informer "search[es] for evidence not voluntarily revealed by the
14  unsuspecting criminal." *United States v. Nerber*, 222 F.3d 597, 605 n.10 (9th Cir.
15  2000) (quoting *United States v. Aguilar*, 883 F.2d 662, 698 (9th Cir. 1989)).
16  Indeed, "there is a substantial distinction between revelations to the Government
17  by a party to conversations with defendant and eavesdropping on conversations
18  without the knowledge or consent of either party to it." *United States v. Karo*,
19  468 U.S. 705, 716 n.4 (1984).

20      Williams contends that Andalon's conduct does not fall within the invited
21  informant exception, because he did not intend her to hear his conversations and
22  he did not know that she was listening in. Opp. (Williams Decl.) ¶ 16. However,
23  it is undisputed that Williams hired Andalon as his housekeeper and that he knew
24  that she had access to all parts of the house in the course of her cleaning duties.
25  Opp. (Williams Decl.) ¶ 14. There is no evidence that Andalon altered the normal
26  course of her cleaning duties, such as by pressing her ear to a closed door or
27  deliberately choosing to clean certain areas at particular times to be at a better
28

24

1    vantage point to hear what Williams was saying.[14]   Furthermore, there is no

2    indication that Williams made any attempt to keep the conversations Andalon

3    overheard private (*see* Opp. at 23:22-23 ("Williams did not go out of his way to

4    hide his [sic] conversation from Andalon")).   To the contrary, the participants in

5    the conversations Andalon purportedly overheard were using Williams's walkie-

6    talkie. Opp. Errata at 258:7-25 (Andalon Depo.).   Andalon says it was easy to

7    hear not only Williams's side of the conversation, but also the person with whom

8    Williams was speaking, because Williams "[had] the volume up when the other

9    person [spoke]." *Id.* at 258:16-25.   These facts establish that Andalon and the

10   SBSD Defendants did not violate Williams's Fourth Amendment rights as to this

11   claim.

12        **(f)    Summary re Unlawful Searches and Seizures**

13        The SBSD Defendants are entitled to qualified immunity regarding the

14   vintage currency and the conversations Andalon purportedly overheard.  The

15   SBSD Defendants are not entitled to qualified immunity regarding the trash, the

16   passport and the answering machine tapes Andalon removed.  As to the

17   documents Andalon read in the course of her duties as Williams's housekeeper,

18   because of the absence of any concrete evidence showing what she did and under

19   what circumstances, plaintiffs cannot prove unconstitutional conduct and thus

20   there is no basis to impose liability on defendants in the first place.

21

22   **2. The Affidavit and Search Warrant**

23        The SBSD Defendants contend that they are entitled to qualified immunity

24

25        [14] That Andalon says she listened to conversations "on purpose" while

26   carrying out her normal cleaning duties is not dispositive.  The issue is not

27   whether Andalon was paying attention to what she could hear Williams saying,

     nor whether Williams knew Andalon was paying attention, but whether Williams

28   knew Andalon was in a position to hear him when he carried out the conversations

     she overheard. *Hoffa*, 385 U.S. at 302.

1  regarding the Affidavit Means drafted in support of the search warrant.

2       In the context of affidavits and search warrants, the Ninth Circuit has

3  summarized the doctrine of qualified immunity as follows:

4  In *Branch v. Tunnell*, 937 F.2d 1382 (9th Cir.1991), we held that the
standard for qualified immunity in a civil rights action of this type is
5  governed by *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57
L.Ed.2d 667 (1978): "The Franks standard, although developed in a
6  criminal context, 'also defines the scope of qualified immunity in
civil rights actions.'" *Id.* at 1387 (quoting *Rivera v. United States*,
7  928 F.2d 592, 604 (2d Cir.1991)). *Franks* established a criminal
defendant's right to an evidentiary hearing when he made a showing
8  of deliberate or reckless disregard for the truth in a search warrant
affidavit and demonstrated that but for the dishonesty, the affidavit
9  would not support a finding of probable cause. *Franks*, 438 U.S. at
171-72, 98 S.Ct. at 2684-85.

10

11  Applying the standards set forth in *Franks*, we held in *Branch* that in
a civil rights case where a claim of judicial deception is made,
12            if an officer 'submitted an affidavit that contained
             statements he knew to be false or would have known to
13            be false had he not recklessly disregarded the truth and
             no accurate information sufficient to constitute probable
14            cause attended the false statements, ... he cannot be said
             to have acted in a reasonable manner,' and the shield of
15            qualified immunity is lost.
*Branch*, 937 F.2d at 1387 (9th Cir.1991) (quoting *Olson v. Tyler*, 771
16  F.2d 277, 281 (7th Cir.1985)).

17  Whether the alleged judicial deception was brought about by material
false statements or material omissions is of no consequence. *United
18  States v. Stanert*, 762 F.2d 775, as amended, 769 F.2d 1410 (9th Cir.
1985). In *Stanert*, we reasoned that by "reporting less than the total
19  story, an affiant can manipulate the inferences a magistrate will
draw." *Id.* at 781.  To allow a magistrate "to be mislead in such a
20  manner could denude the probable cause requirement of all real
meaning." *Id.*  Accordingly, a Fourth Amendment violation occurs
21  where "the affiant intentionally or recklessly omitted facts required to
prevent technically true statements in the affidavit from being
22  misleading." *Id.*

23  In *Hervey v. Estes*, 65 F.3d 784 (9th Cir.1995), we clarified the
mechanics of a judicial deception claim and carefully spelled out the
24  burden a plaintiff must meet in order to survive a defendant officer's
motion for summary judgment on the ground of qualified immunity.
25  We held in that case that the plaintiff must 1) make a "substantial
showing" of deliberate falsehood or reckless disregard for the truth
26  and 2) establish that, but for the dishonesty, the challenged action
would not have occurred. *Id.* at 788-89 (citing *Branch*, 937 F.2d at
27  1388).  If a plaintiff satisfies these requirements, "the matter should
go to trial." *Id.* at 789.  Put another way, "the showing necessary to
28  get to a jury in a 1983 action is the same as the showing necessary to
get an evidentiary hearing under Franks." *Id.* (citing *Snell v. Tunnell*,
920 F.2d 673, 698 (10th Cir.1990)); *see also, Lombardi v. City of El*

1    *Cajon*, 117 F.3d 1117 (9th Cir.1997).

2    *Liston v. County of Riverside*, 120 F.3d 965, 972-73 (9th Cir. 1997).

3         The Supreme Court in *Franks* provided some guidance on what Williams

4    must do to make a "substantial showing" of a deliberate falsehood or reckless

5    disregard for the truth.  Williams's attack on the Affidavit

6    > must be more than conclusory and must be supported by more than a mere
     > desire to cross-examine.  There must be allegations of deliberate falsehood
7    > or of reckless disregard for the truth, and those allegations must be
     > accompanied by an offer of proof.  They should point out specifically the
8    > portion of the warrant affidavit that is claimed to be false; and they should
     > be accompanied by a statement of supporting reasons.  Affidavits or sworn
9    > or otherwise reliable statements of witnesses should be furnished, or their
     > absence satisfactorily explained.  Allegations of negligence or innocent
10   > mistake are insufficient.

11   *Franks*, 438 U.S. at 171.

12        Additionally, and of particular importance here, "[t]he deliberate falsity or

13   reckless disregard whose impeachment is permitted . . . is only that of the affiant,

14   not of any nongovernmental informant." *Id.*  Thus, Williams's allegations

15   regarding Andalon's purported lies (and his papers are replete with them) are

16   insufficient.  Rather, the inquiry is whether Means included information –

17   obtained from Andalon or other sources – that *Means* "knew to be false or would

18   have known to be false had he not recklessly disregarded the truth." *Liston,*120

19   F.3d at 972.[15]

20

21        [15] It is undisputed that it was Means who actually drafted the Affidavit.

22   Defendants argue that because Defendants Palera, Olmstead, Hermreck, Gracey,

23   Dollar, Cintron, Birchim, Swopes and Auchincloss were not affiants, they cannot
     be liable for any of the purported misrepresentations in the affidavit.  Defendants

24   are mistaken.  *See Hart v. O'Brien*, 127 F.3d 424, 448 (5th Cir. 1997), abrogated

25   on other grounds, *Spivey v. Robertson*, 197 F.3d 772 (5th Cir. 1999) ("[A]
     deliberate or reckless misstatement or omission by a governmental official who is

26   not the affiant may nevertheless form the basis of a *Franks* claim."); *United States*

27   *v. DeLeon*, 979 F.2d 761, 763-74 (9th Cir. 1992) (same).  However, because
     Williams has provided absolutely no evidence of any deliberate or reckless

28   misstatement or omission by any SBSD Defendant other than Means, the other
     defendants are immune from liability for a *Franks* violation.

1      **(a)   Money Laundering**

2          Williams has submitted a list of 151 purported inaccuracies and omissions

3  in the Affidavit.  Many are so picayune that they do not even warrant

4  commentary, such as that the affidavit did not reveal that a bag suitable for "large

5  amounts of currency" also is suitable for many other things.  Many other entries –

6  indeed, the bulk – challenge not the accuracy of what the affidavit states about

7  Williams's conduct, but the soundness of the inferences and conclusions that

8  Detective Means drew from largely indisputable facts.  The Court concludes that,

9  on balance,  these alleged mistakes were neither reckless nor intentionally false.

10       Means's Affidavit advances several theories regarding money laundering.

11  First, Means suggests that Williams's net worth increased dramatically when he

12  moved to Santa Ynez in 1996 and that this sudden accumulation of wealth was

13  unexplained.  The Affidavit contends that Williams was raised in the Hollywood

14  Hills and lived a "moderate life style" until he moved to Santa Ynez in 1996. *See*

15  Appendix A at FA 11.  The Affidavit does not explain how Means came upon

16  that information.  In support of the "moderate life style" assertion, Means also

17  reported Andalon's observation that when she began working for Williams in

18  1996, Williams's personal belongings were "old and insignificant." *Id.* at FA 28.

19  The Affidavit also reported that Means had documentation "showing Williams

20  was at one time in default on student loans as well as having a credit history

21  prohibiting him from receiving credit." *Id.* FA 145-46.  The Affidavit noted

22  further that "[g]iven that history, Williams has been able to gather enough

23  unaccounted for cash and assets, in the short period of time depicted in this

24  Affidavit, to purchase real and personal property . . . valued in excess of

25  $9,088,966." *Id.*  The Affidavit estimated that by January 2000 Williams had

26  accumulated approximately $20,000,000 in money and capital. Aff't at 4.  Means

27  also asserted that Williams's inheritance of only $500,000 was "significant,

28  because it indicates the limited amount of accessible cash on hand for Williams."

1   Appendix A at FA 20.

2   The Affidavit's central theory in support of the money laundering charge
3   was a detailed analysis of publicly available information about Williams's assets,
4   business entities and other income.  Means asserted that as a result of that
5   analysis, he "can show" that Williams had spent about $2.2 million more between
6   1994 and 1999 than could be accounted for by reference to legitimate income and
7   that "additional documentation . . . will further show a major discrepancy in
8   sources of income and applications of income."  Aff't at 48-49.  That conclusion
9   was reached based on a detailed "source and application" analysis in which
10  Williams's sources of income and expenditures were compared during the four
11  year investigation.  The study considered all of Williams's known property,
12  assets, bank accounts, debts and other interests, and estimated the net income or
13  loss associated with each.  The analysis was in a discrete section of the Affidavit,
14  occupying 18 of that document's 57 pages.  *See* Aff't at 34-51 (Section V: Source
15  and Application).

16  Williams asserts that Means's account is false.  He states that he grew up in
17  a wealthy family in the Pacific Palisades, that he had many wealthy relatives who
18  gave him money over the years, Appendix A at FA 11, and that Means completely
19  ignored other potential sources of wealth such as the "Williams Family Trust" and
20  the "Harry D. Williams Trust," which Means knew existed.  *Id.* at FA 20.
21  Williams also argues that Means should have doubted Andalon's account of
22  Williams's "insignificant" possessions, given that Means knew that Williams had
23  purchased luxury items – such as a single-engine plane and a new BMW – before
24  Williams moved to Santa Ynez.  *Id.* at FA 28.  Williams observes that none of
25  those facts was mentioned in the Affidavit.  Moreover, Williams contends, it was
26  reckless for Means to characterize a rejection letter associated with his
27  application for an MBNA credit card as depicting a "credit history prohibiting
28  him from receiving credit," especially given that Means knew that Williams had

1    been approved for a $900,000 mortgage on his Santa Ynez residence about seven

2    months before the MBNA rejection and that documents attached to the Affidavit

3    itself demonstrated that the credit rejection was merely an error that was

4    subsequently corrected. *Id.* at FA 145-46.

5            Next, Williams argues that Means failed to include a crucial caveat to the

6    entire analysis. The SBSD retained Brenton Chinn, an investigative auditor for

7    the California Department of Justice with expertise in financial analysis

8    connected to narcotics investigations, to analyze the financial data. He expressed

9    strong reservations about the analysis. Chinn told Means that given the

10   insufficient information he had to work to work with, he could not even arrive at

11   a "tentative or provisional" determination concerning money laundering.

12   Appendix B No. 1. Chinn also told Means that the source and application

13   analysis "wasn't complete," because SBSD did not have information about what

14   Williams's assets were at the beginning of the time period examined, nor the

15   income generated from the brokerage accounts SBSD knew Williams had. As a

16   result, any source and application analysis "wouldn't lead to any kind of

17   conclusion." *Id.* No. 3. Chinn also stated that he did not have sufficient

18   information to do a meaningful "net worth" analysis on Williams. *Id.* No. 2.

19   Nonetheless, as mentioned above, the 18 page source and application analysis

20   culminated in the statement that "[based on the information discovered by your

21   affiant . . . your affiant *can show* that Williams has an unaccounted for income of

22   $2,223,313." Aff't at 48-49 (emphasis added). The only indication Means placed

23   in his Affidavit that the source and application analysis was far from conclusive

24   was his statement that "[y]our affiant's time line analysis is not a complete

25   reconstruction of Williams's financial status due to the lack of documentation."

26   Appendix B No. 3.

27           Williams also argues that when carrying out the source and application

28   analysis, Means recklessly omitted competing explanations for purported

                                              30

1   disappearances of cash.  For example, Means noted a wire transfer of $1,040,000

2   from Williams's account to an unidentified Pictet and Cie account in Switzerland.

3   Based on a draft Williams financial statement that Means had acquired from the

4   trash of Williams's bookkeeper, Means knew that Williams had a Pictet and Cie

5   account, but not the account number.  Means treated the $1.04 million as an

6   "application" (money expended), because the money was being transferred from a

7   known Williams account to an unknown one.  He did not inform the Superior

8   Court judge of the possibility that Williams had transferred the money to his own

9   account in Switzerland.  Such a transfer would not constitute an application at all.

10  Given that this sum constituted half of the unaccounted-for $2 million, Williams

11  contends, the failure to inform the Magistrate of the possibility that Williams

12  controlled the Pictet and Cie account was reckless, especially given Williams's

13  demonstrated propensity for transferring money between his various accounts.

14  Aff't at 41-44.

15         Finally, Williams contends that Means misleadingly characterized some of

16  his activities so that they would appear as "key indicators" of money laundering

17  activity.  For example, he listed "travel to the Caribbean region or to Switzerland"

18  as a key indicator of money laundering activity, despite that over the course of the

19  four year investigation SBSD had evidence that Williams had traveled to the

20  Caribbean only once and that Williams had a home in Switzerland.  Appendix A

21  at FA 151a.  Means also characterized Williams as "paying for goods and services

22  with cash to avoid placing monies in the banking system."  *Id.* at FA 151b.  The

23  only evidence supporting this assertion was Andalon's statement that she and

24  other employees of Williams had been paid in cash.  Williams contends that this

25  was misleading, given that Andalon was Williams's housekeeper and that there is

26  nothing particularly unusual about paying a housekeeper in cash.

27         In *United States v. Elliott*, ___ F.3d ___, 2003 WL 930953 (March 10,

28  2003), the Ninth Circuit very recently dealt with a claim that an affidavit used to

31

1   obtain a search warrant was replete with false and recklessly misleading

2   statements and omissions. The detective/affiant stated that the informant had

3   been arrested numerous times but failed to disclose he had fourteen prior

4   convictions. *Id.* at *2. The affidavit stated that the informant had not been

5   arrested for crimes related to false information to police or perjury; he had been

6   arrested for forgery. *Id.* The affidavit stated that the informant had seen the

7   defendant "in possession" of methamphetamine; in fact the informant had merely

8   told the affiant that defendant, with others, had been in a room where the

9   methamphetamine was visible. *Id.* The Ninth Circuit found "no material falsity"

10   in the affiant's use of the word "possession" to describe the information that the

11   informant had given him. The Court went on to assume arguendo that the

12   affidavit was misleading as to the informant's personal history (and other

13   matters), but that the second step under *Franks* was not satisfied, because the

14   affidavit nonetheless established probable cause. In reaching that conclusion, it

15   found that the informant's "record of providing six reliable drug-related tips in

16   the preceding three months was sufficient to overcome any doubts raised by his

17   motives and prior criminal and personal behavior." *Id.* at *4.

18         Here, Detective Means relied heavily on Andalon. She had assisted the

19   SBSD at least 25 cases and not once had she provided information that turned

20   out to be false or unreliable. Motion (Palera 01 Decl.) ¶¶ 1,2. On this record, the

21   Court cannot find that Andalon lied to Means, much less that Means knew of any

22   lie. That she turned out to be mistaken in the inferences she drew about what she

23   saw, heard and found is a given; had she been entirely correct, this case would

24   never have been filed. So was Means entitled to rely on her, at least in part? He

25   was. Before filing the Affidavit, Means reviewed with Andalon the references to

26   her and the information she disclosed and she confirmed the accuracy of those

27   statements. Means Decl. ¶ 23.

28         Going beyond what Andalon disclosed, if Means's mistakes were innocent,

32

1  he would be entitled to qualified immunity. See *United States v. Hammett*, 236

2  F.3d 1054, 1058 (9th Cir. 2001). "The concern of the immunity inquiry is to

3  acknowledge that reasonable mistakes can be made as to the legal constraints on

4  particular police conduct." *Saucier*, 533 U.S. at 205. As the Supreme Court in

5  *Saucier* also noted, "officers can have reasonable, but mistaken, beliefs as to the

6  facts establishing the existence of probable cause . . . and in those situations

7  courts will not hold that they have violated the Constitution. *Id.* at 206.

8  Similarly, if Means acted in good faith Williams's claims for relief must be

9  denied. See *United States v. Mendonsa*, 989 F.2d 366, 369 (9th Cir. 1993)

10  (applying "good faith" exception to principle requiring exclusion of evidence

11  derived from a warrant lacking probable cause, because police officer reasonably

12  relied on advice from county attorney).

13      Detective Means arranged for a Deputy District Attorney to review a draft

14  of the Affidavit and he incorporated changes suggested by that attorney. Means

15  Decl. ¶ 22; Means Reply Decl. ¶ 20. He showed the warrants and affidavits to,

16  and received, relied on and incorporated information from several law

17  enforcement agencies, such as the IRS, the U.S. Attorney's Office and the

18  California Department of Justice. Means Decl. at ¶¶ 28, 30. Means had received

19  some training in money laundering and financial investigations, *Id* at ¶ 13, and he

20  has cited 14 "indicators" of money laundering activity that were consistent with

21  the conduct of Williams that is described in the affidavit. *Id* Detective

22  McCammon, another key source of material incorporated into Means's affidavit,

23  confirmed the accuracy of the information attributed to her. *Id*. ¶ 27.

24      Williams complains, "It is apparent that Detective Means and whoever

25  assisted him . . . were in over their heads and should not have been engaged in

26  this analysis [of structuring of business entities and commercial real estate

27  transactions]." Williams Decl. ¶ 41. That these officers were not as sophisticated

28  as Williams, or as a high-powered forensic accountant may have been, is

1  irrelevant.  By seeking advice from and relying on the greater expertise of Chinn

2  and others, Means at least displayed an absence of intentional deceit.

3       Finally, Williams's core contention is that the entire financial analysis in

4  the affidavit was wrong and reckless because "Defendants not only knew they

5  had no reliable benchmark, they *knew* that the lack (of such a) benchmark

6  rendered it impossible to render any opinion as to Williams suddenly

7  accumulating unexplained wealth, or money laundering . . . ."  Williams's

8  Opposition, p. 8.  This contention rests heavily on Williams's assertion that the

9  bulk, or at least a great part, of his wealth came from trusts and that Means knew

10 about the trusts but failed properly to investigate or account for them.  (Williams

11 also attributes his wealth to life insurance proceeds.)  This argument founders for

12 at least two important reasons.  First, Williams has not provided evidence that

13 establishes or corroborates his conclusory claims about such inherited wealth.[16]

14 Second, Williams himself admitted that much of his wealth and assets was not

15 subject to discovery by a public records search.  Motion Exh. K (Williams Depo.)

16 at 273-74.  Moreover, as previously noted, the affidavit *does* point out the

17 limitations and gaps in the financial analyses: "Your affiant's time line analysis is

18 not a complete reconstruction of Williams' financial status due to the lack of

19 documentation."  Affidavit at 48.

20      For these reasons, Williams's *Franks v. Delaware* claim regarding the

21 money laundering allegation founders.  Williams has not accomplished the first

22 step of showing that Detective Means deliberately or recklessly included false or

23 misleading information or deliberately or recklessly omitted material information.

24      **(b)    Narcotics**

25      The Affidavit stated "Your affiant's investigations revealed that Williams

26

27
_____

28 [16] This defect also undermines Williams's opposition in other instances, such as his contention that his rental income greatly exceeded that which Means calculated at page 36 of the Affidavit.

34

1   has been associated with illegal narcotics." Aff't at 4.  First, as already discussed
2   in this Order, Means relied almost exclusively on information he obtained from
3   Andalon to support this assertion.  Means reported that Andalon had found
4   "suspicious" currency in a garbage bag in Williams's garage that Means
5   ultimately determined to be vintage 1934 and 1935 currency.  Aff't at 10-11.
6   Based on Andalon's account of the volume of currency she found, Means
7   determined that the currency's face value was between $640,000 and $3,840,000.
8   Aff't at 52.  Means also reported that Andalon had noticed a "strong chemical
9   odor, consistent with that of methamphetamine, coming from the closet in
10  Williams's bedroom" on two occasions.  Appendix A at FA 43 & 98.  He further
11  reported that Andalon had once noticed a "chemical odor consistent with the odor
12  associated with methamphetamine" coming from Plaintiff Paul's duffel bag.  *Id.*
13  at FA 48.  According to Means, Andalon also disclosed that on "numerous
14  occasions" during the several months before January 2000, three women driving
15  cars with Arizona license plates delivered nylon bags to Williams at his
16  residence.  *Id.* at FA 56.  Andalon also apparently told Means that she had once
17  seen Williams with a white powder under his nose, *id.* at FA 65, and overheard
18  him make suspicious statements over the telephone.  Appendix B No. 7.[17]
19  Andalon also apparently reported that Plaintiff Schade delivered "suspicious
20  packages" to Williams regularly.  *Id.* No. 8.  Means did not state that during the
21  four year investigation Andalon – or anyone else – ever saw any illegal narcotics
22  or narcotics paraphernalia in Williams's house, nor did he state that anyone
23  witnessed a narcotics-related transaction there.
24        Williams's challenges to evidence about narcotics activity presented in the
25  Affidavit are not sufficient for a "substantial showing" that Means included
26
27
28  _____
    [17]  For example, Means stated that Andalon once overheard Williams say:
    "Don't worry about an investigation.  If they can't find the money, then there is no
    evidence.  Without evidence there is no case."  Appendix B. No. 7.

1   "deliberate falsehoods" or displayed a "reckless disregard for the truth" in his
2   reporting of Andalon's accounts. *Liston,* 120 F.3d at 973. Nor has Williams
3   shown that Means deliberately or recklessly omitted material information. *Id.*
4   For example, Williams charges that Means deliberately did not provide the date
5   that Andalon first noticed the apparent odor of methamphetamine coming from
6   Williams's closet, in an attempt to cover up the staleness of that evidence.
7   (Andalon apparently reported this occurrence on March 25, 1998, some 21
8   months before the Affidavit was presented to Judge McLafferty. Appendix A at
9   FA 43.) However, *the Affidavit actually does indicate (although not very clearly)*
10  that Andalon discovered the smell early in the investigation, since it states that
11  she noticed the smell during the period in which she had unlimited access to all
12  parts of the house. The Affidavit reports that Andalon had such unlimited access
13  at the beginning of her employment, but that Williams later limited her access as
14  she began to notice "suspicious activity." Aff't at 11. Given these circumstances,
15  the Court cannot conclude that Means's failure to include the precise date
16  Andalon discovered the smell was intentional or reckless.[18]

17      Williams also argues that it was reckless for Means to believe Andalon,
18  given some of Andalon's bizarre observations, such as having observed bestiality.
19  However, and as noted above, the Court cannot conclude that Means was not
20  entitled to credit Andalon's observations, given that she had proved a reliable
21  informant in at least 25 prior cases, many of which involved narcotics. Moreover,
22  Means included several of those peculiar observations – that Williams paid his
23

---

24      [18] A mere lapse of time does not automatically render old observations
25  incapable of supporting probable cause. Staleness must be evaluated "in light of
    the particular facts of the case and the nature of the criminal activity and property
26  sought." *United States v. Lacy,* 119 F.3d 742, 745 (9th Cir. 1997) (ten month
27  interval). Where evidence indicates an on-going criminal business as was the case
    here (however mistaken that conclusion may have been), significant lapses of time
28  are permitted. *United States v. Pitts,* 6 F.3d 1366, 1369-70 (9th Cir. 1993); *United
    States v. Greany,* 929 F.2d 523, 525 (9th Cir. 1991) (two year interval).

1   staff in vintage currency worth more than its face value and that Williams had
2   asked his housekeeper about obtaining fictitious Mexican passports – in the
3   Affidavit, thus allowing the Magistrate to draw his own conclusions.  Aff't at 10-
4   11, 16.

5          Given that Williams was entitled to rely on Andalon's observations, the
6   Court cannot find that Means included intentionally false information in the
7   Affidavit when he stated that on a second occasion Andalon had noticed the odor
8   of methamphetamine emanating from the closet, this time on October 22, 1999,
9   almost 3 months before the Affidavit was presented to the judge, and from Paul's
10  duffel bag.  Although Andalon did not identify the smells as methamphetamine in
11  her initial reports of those incidents, she later identified them as
12  methamphetamine when Means read the complete Affidavit to her before
13  submitting it to the magistrate.  Motion (Means Decl.) ¶ 23.  Given Andalon's
14  history as an informant, Means was entitled to rely on her and include those
15  details in the Affidavit.

16         For the same reasons, Means was entitled to rely on Andalon's reports that
17  Plaintiff Schade had delivered "suspicious" packages regularly to Williams's
18  house and Andalon's accounts of the suspicious couriers from Arizona.

19         Also, that Andalon spoke in "broken English," Motion Exh. Y (Olmstead
20  Depo.) at 16:5-9, does not render reckless Means's reporting of the suspicious
21  conversations she allegedly overheard.  Andalon's difficulty in speaking English
22  does not necessarily show that she was unable to comprehend basic English
23  phrases.  Such phrases as "if they can't find the money, then there is no
24  evidence," were not so sophisticated or complicated that Andalon could not have
25  understood them.

26         For the foregoing reasons, Williams has not shown that Means deliberately
27  or recklessly included false information in the Affidavit, nor deliberately or
28  recklessly omitted material information.  Detective Means's reliance on

1  Andalon's representations, while ultimately found not to warrant prosecution,

2  was not reckless, and as Judge Hupp concluded, "there is no indication that [he]

3  inaccurately set forth what he was told." 12/10/01 Order at 2. Accordingly,

4  Williams has not successfully accomplished the first step necessary to his *Franks*

5  *v. Delaware* claim regarding the narcotics allegations in the Affidavit.

6     **(c)    Probable Cause**

7     Reviewing courts should accord great deference to a magistrate's judgment

8  as to whether there is probable cause. *Illinois v. Gates*, 462 U.S. 213, 236 (1983).

9  Judge Hupp already found that on its face the Affidavit provided enough

10 evidence for probable cause that money laundering existed. 12/10/01 Order at 2.

11 Even after further examination, this Court reaches the same conclusion,

12 notwithstanding that the Affidavit may have contained information derived from

13 the unlawfully searched or seized passport. *See supra* at 19.

14    As to the narcotics activity, in evaluationg whether an affidavit establishes

15 probable cause, the magistrate must consider the facts and circumstances in a

16 practical, common sense manner. *Gates*, 462 U.S. at 238. A law enforcement

17 officer also should be entitled to rely on "practical and common sense"

18 observations and inferences. That there was sufficient basis to find probable

19 cause for money laundering can properly be a factor in assessing probable cause

20 about narcotics activity; after all, the two often go together. Based on the matter

21 recited in the Affidavit and the indisputable link between money laundering and

22 narcotics activity, although the question is very close, the Court concludes there

23 was probable cause to suspect illegal narcotics activity.

24    This Court does not approve of the SBSD's investigation. It was

25 misguided and overblown. It is regrettable that the SBSD's zeal to investigate

26 apparently criminal conduct wreaked havoc on Williams, on many of his business

27 entities and on others. But Defendant Means's preparation of the Affidavit and

28 submission of it to the Superior Court judge entitles him to qualified immunity.

38

1

2 **3. Detention During Execution of the Warrant**

3    Defendants Palera and Olmstead move for Summary Judgment on

4 Williams's claim that he was unreasonably detained during the search of his

5 residence.[19] They argue first that Williams was never detained; he was free to

6 leave at any time. Alternatively, they argue that even if Williams was detained

7 during the search, the detention was constitutional.

8    Defendants' first argument may be disposed of quickly. Williams contends

9 that he could not leave the property during the search, because an officer had told

10 him "not to go anywhere [or] do anything." Opp. Exh. G at 63:6-9 (Williams

11 Depo.). Defendants dispute Williams's version of the events and contend that

12 "[a]t no time during the execution of the search warrant was Williams told he was

13 being detained." Motion (Palera 01 Decl.) ¶ 4. Construing the facts in

14 Williams's favor, his version would constitute a "seizure" within the meaning of

15 the Fourth Amendment. *Michigan v. Summers*, 452 U.S. 692, 696 (1981)

16 (finding that a seizure occurred where respondent was not free to leave the

17 premises during search).

18    The Court holds that a genuine issue of fact exists regarding whether the

19 detention was reasonable. In *Summers*, the Court held that "a warrant to search

20 for contraband founded on probable cause implicitly carries with it the limited

21 authority to detain the occupants of the premises while a proper search is

22 conducted." *Id.* 452 U.S. at 705 (footnotes omitted). However, the Court also

23 noted that "special circumstances, or possibly a prolonged detention, might lead

24 to a different conclusion in an unusual case." *Id.* at 705 n. 21. Elaborating on

25 *Summers*, the Ninth Circuit has held that "[a] detention in connection with a

26 search may be unreasonable if it is unnecessarily painful, degrading, or

27 _____

28    [19] None of the other Defendants who are parties to this motion was present
during the search of Williams's house. Index of Plaintiffs' claims No. 4.

39

1 | prolonged, or if it involved an undue invasion of privacy. Of course, the presence
2 | of any of these factors in an individual case does not establish that the detention
3 | is unreasonable *per se*. Rather, these factors . . . and any other circumstances
4 | relevant to an individual case, must be assessed in their totality." *Mena v. Simi*
5 | *Valley*, 226 F.3d 1031, 1040 (9th Cir. 2000) (quoting *Franklin v. Foxworth*, 31
6 | F.3d 873, 876 (9th Cir. 1994)).

7 | Here, Williams claims to have been detained on his property during the
8 | entire search, which lasted from approximately 8:30 a.m. to 6:00 p.m. Reply SGI
9 | ¶ 308. During that time, he was subjected to a lengthy interview with Palera and
10 | Olmstead. Reply (Palera 03 Decl.) ¶ 3. While it is true that Williams was never
11 | handcuffed and was permitted to get food and water and use the restroom during
12 | that time, if he was detained it was for a period of approximately nine and a half
13 | hours. In both the *Mena* and *Franklin* cases in which the Ninth Circuit held the
14 | detentions unreasonable, the detentions were considerably briefer. *Mena*, 226
15 | F.3d at 1035 (two to three hour detention); *Franklin*, 31 F.3d at 875 (two hour
16 | detention).[20] The Court cannot find that no reasonable jury could determine that
17 | Williams was detained and that the length of the detention rendered it
18 | unreasonable. Accordingly, the motion of Defendants Palera and Olmstead is
19 | DENIED.

20 |

21 | **4. Damage to Williams's Property During Execution of the Warrant**
22 | Williams alleges that in the course of executing the warrant the officers
23 | damaged his front gate, his copy machine and his sub-zero refrigerator. He also
24 | says an officer left the door to his Ferrari open "just a crack" such that the battery
25 | was drained and had to be replaced. Additionally, Williams complains of the
26 | officers' "general disrespect" for his property in that they left a bed overturned,

27 |

28 | 
---

[20] The Court notes, however, that those cases also involved other unreasonable conduct not present in this case.

1  clothes on the floor and the contents of cabinets and drawers removed. *These*

2  *allegations are not sufficient to rise to the level of a constitutional violation.*

3    "[O]fficers executing search warrants on occasion must damage property in

4  order to perform their duty." *Dalia v. United States*, 441 U.S. 238, 258 (1979).

5  Damage to property that is merely negligent during execution of a warrant is not a

6  constitutional violation. *Bergquist v. Cochise*, 806 F.2d 1364, 1369 (9th Cir.

7  1986), abrogated on other grounds, *Canton v. Harris*, 489 U.S. 378 (1989).

8  Rather, "only unnecessarily destructive behavior, beyond that necessary to

9  execute a warrant effectively, violates the Fourth Amendment." *Mena*, 226 F.3d

10  at 1041 (quoting *Liston v. Riverside*, 120 F.3d 965, 979 (9th Cir. 1997)). If

11  "allegations charging conduct beyond mere negligence are entirely conclusory

12  and unsupported by any facts alleged in the complaint, dismissal [is] appropriate."

13  *Bergquist*, 806 F.2d at 1369 (quoting *Mann v. Tucson*, 782 F.2d 790, 793 (9th

14  Cir. 1986).

15    Williams has not proffered any evidence that any of the damage that

16  occurred was more than merely negligent, nor that any of the damage occurred as

17  a result of conduct unnecessary to execute the warrant. There is no showing that

18  the damage to the front gate occurred other than when Palera disabled it to permit

19  the officers to enter Williams's property upon their discovery that no one was

20  home to let them in. Nor has Williams shown that Palera caused more damage to

21  the gate than was necessary to enable the officers to enter. Similarly, the officers

22  were entitled to search for illegal narcotics and documents in Williams's

23  photocopy machine, his freezer and his cars. Williams has proffered no evidence

24  that the officers deliberately or recklessly caused the damage to those items, nor

25  has he proffered evidence that the damage that occurred was greater than

26  necessary to execute the warrant. Therefore, Defendants Palera and Olmstead's

27  motion for Summary Judgment on this claim is GRANTED.

28

**5. Retention of Seized Property After Execution of the Warrant**

The Defendants held a significant amount of Williams's property until the end of June 2001 when Means contacted Williams's attorneys and advised them that property seized from Williams's residence was available for release. Williams contends that holding his property for almost one and a half years (the property was seized on January 20, 2000) was unreasonable.[21] He contends that "shortly after the search the defendants realized there was no evidence of possible criminal activity other than their cockamamie theory that Williams had stolen stocks and bonds from his sister." Opp. at 21. As a result, Williams contends that Defendants had no grounds to oppose Williams's August 10, 2000 Motion for Return of Property in Santa Barbara Superior Court.

However, Williams has proffered no evidence that Defendants' actions were unreasonable in this regard.[22] The Santa Barbara Superior Court denied Williams's motion for return of his property on August 17, 2000 on the basis that the investigation was "on-going," and that Williams could make arrangements with Means to see and copy the documents Williams needed. Motion Exh. BB at 1184 (Minute Order). Williams has not proffered evidence that the investigation was not "on-going" as the Superior Court judge found. Means's deposition, cited by Williams, reveals that around the time Williams made his August 2000 motion, Means was "review[ing] documents" in the course of investigating

---

[21] Defendants point out that some of Williams's property was returned to him before this time. However, that has little bearing on Williams's contention that it was unreasonable for them to hold most of his property until June 2001. Also, Defendants make much of the fact that it was reasonable for them to delay the release of items where there was a legitimate dispute regarding ownership. But this also has no bearing on whether holding items that unquestionably belonged to Williams was reasonable.

[22] Williams proffers absolutely no evidence that Defendants Palera, Olmstead, Hermreck, Gracey, Dollar, Cintron, Birchim or Swopes had any involvement at all with the retention of Williams's property.

1   possible loan fraud. Additionally, Means states that the IRS began investigating
2   Williams at that time. Opp. Exh. B. at 40:12-41:17 (Means Depo.). Williams
3   proffers no evidence that the SBSD violated or even resisted the court's order to
4   allow Williams to inspect and copy the documents he needed. In fact, Williams
5   does not dispute that copies were made for his use between September 21, 2000
6   and November 27, 2000. SGI ¶ 225. Finally, Williams proffers no evidence that
7   the District Attorney acted in bad faith in taking until April 2001 to decide
8   whether to prosecute Williams.

9        For these reasons, the SBSD Defendants' motion for Summary Judgment
10  on this claim is GRANTED.

11

12                                    **V.**

13                               **CONCLUSION**

14       For the foregoing reasons, the SBSD Defendants' Motion for Partial
15  Summary Judgment against Plaintiff Williams is GRANTED in part and DENIED
16  in part. The Court's specific rulings are as follows:

17  1.    The SBSD Defendants are entitled to qualified immunity regarding the
18        vintage currency Andalon removed from Williams's house, as well as the
19        conversations Andalon purportedly overheard. Although Williams has not
20        proffered any evidence tending to show which particular SBSD Defendants
21        may be liable, they are not entitled to qualified immunity regarding the
22        passport, trash and answering machine tapes Andalon removed. As to the
23        documents Andalon read in the course of her duties as Williams's
24        housekeeper, because of the absence of any concrete evidence showing
25        what she did and under what circumstances, plaintiffs cannot prove
26        unconstitutional conduct.

27  2.    Defendant Means is entitled to qualified immunity regarding the Affidavit.

28  3.    The Court DENIES Defendants' Summary Judgment Motion regarding

1   whether the purported detention of Williams by Defendants Palera and

2   Olmstead was unconstitutional, because there is a genuine issue of material

3   fact.

4   4.   The Court GRANTS Defendants' Summary Judgment Motion regarding

5        the property damaged during execution of the warrant.

6   5.   The Court GRANTS Defendants' Summary Judgment Motion regarding

7        the alleged inappropriate retention of Williams's property.

8

9   IT IS SO ORDERED.

10

11  DATE: March 21, 2003

12                                          A. Howard Matz
                                            United States District Judge

13

14

15        Docket No. 223.

16

17

18

19

20

21

22

23

24

25

26

27

28

# APPENDIX A

# SELECTED FALSE/MISLEADING FACTS IN MEANS AFFIDAVIT

| FA No. (see Mot. Exh. F) | Fact Reported in Aff't | Support | Williams's Version | Support |
|---|---|---|---|---|
| | | **Money Laundering and Williams's Finances** | | |
| 11 | "Williams . . . was raised . . . in the Hollywood Hills area of Los Angeles. Williams lived a moderate life style until he moved the Santa Ynez Valley" in 1996. | Aff't at 6. | Williams "grew up in a wealthy family in a home in Pacific Palisades, not in a moderate life style." | Opp. (Williams Decl.) ¶ 9. |
| | | | Williams "began investing when [he] was 12 or 13, often with [his] father] and [he] has continued investing all [his] life, in real estate, stocks, bonds and other investments. Many of [his] wealthy relatives gifted [him] money over the years beginning in [his] childhood." | Opp. (Williams Decl.) ¶ 9. |
| | | | Williams purchased a single-engine airplane in October 1994 and a BMW sedan (1995 model) in November 1994. | Aff't at 44, 47. |

A - 1

| FA No. (see Mot. Exh. F) | Fact Reported in Aff't | Support | Williams's Version | Support |
|---|---|---|---|---|
| 20 | "[T]he cash inheritance to Richards and her brother, Williams, was approximately $500,000. Your affiant finds this significant, because it indicates the limited amount of accessible cash on hand for Williams." | Aff't at 8 | Means knew about, but failed to investigate, the nature and value of the "Williams Family Trust" and the "Harry D. Williams Trust." Means listed the trusts on page 25 of the Affidavit without drawing attention to them or postulating that these trusts could be a source of Williams' wealth. | Opp. Exh. B (Means Depo.) at 307:11 to 308:23. |
| 28 | When Andalon began working for Williams in March 1996, she observed that Williams' personal belongings were "old and insignificant." | Aff't at 10 | Williams purchased a single-engine airplane in October 1994 and a BMW sedan (1995 model) in November 1994. | Aff't at 44, 47. |
|  |  |  | Williams maintains that he did not have "poor and insignificant personal possessions and clothes when [he] moved to Santa Ynez" and that "there was no significant change to my spending habits after I arrived in Santa Ynez." | Opp. (Williams Decl.) ¶¶ 9-10. |

| FA No. (see Mot. Exh. F) | Fact Reported in Aff't | Support | Williams's Version | Support |
|---|---|---|---|---|
| 131 | Means postulated that the annual income of the "La Jolla" property was $36,038. Means based his determination on a single document he had found indicating that the "La Jolla, LLC" account on 10-28-98 contained a $3,003 balance. He assumed this figure was the monthly profits of the property and thus multiplied it by 12. | Aff. at 36 | This "snapshot" of a banking record is a poor way to assess the annual income of any property. The Williams' 1998 financial statement – which Defendants had – stated that the income from that property was $216,000 per year. Even if SBSD suspected that Williams had overstated his earnings in that statement, attributing such a small profit to this property on the basis of such paltry evidence was irresponsible. Means' method of analysis resulted in an understatement of up to $755,000. | Opp. Exh. J(II) (Valenti Decl.) ¶ 13b. |

A - 3

| FA No.<br>(see Mot.<br>Exh. F) | Fact Reported in Aff't | Support | Williams's Version | Support |
|---|---|---|---|---|
| 145-46 | "Your affiant has documentation showing Williams was at one time in default on student loans as well as having a credit history prohibiting him from receiving credit. Given that history Williams has been able to gather enough unaccounted for cash and assets, in the short period of time depicted in this Affidavit, to purchase real and personal property throughout the United States and overseas, valued in excess of $9,088,966." | Aff't at 49. | Williams contends that the negative credit report attached to the Affidavit was an error that was subsequently corrected.<br><br>Williams contends that documents attached to the Affidavit itself indicated that the "error" was corrected about nine months later.<br><br>Williams argues that it was reckless to state that Williams' credit history "prohibited him from receiving credit" when the only evidence of credit rejection was an application for an MBNA credit card and when Means knew that Williams had been approved for a $900,000 mortgage on his Santa Ynez residence about 7 months prior to the MBNA rejection. | Opp. (Williams Decl.) ¶ 39.<br><br>Motion Vol. 3 Exh. G Tab 39 at 909.<br><br>Motion Vol. 3 Exh. G Tab 39 at 906; Tab 34 at 815. |

| FA No. (see Mot. Exh. F) | Fact Reported in Aff't | Support | Williams's Version | Support |
|---|---|---|---|---|
| 151a | "Travel to the Caribbean region or to Switzerland" is a "key indicator" of money laundering activity. | Aff't at 54. | Williams argues that Means was reckless in including this travel as a "key indicator," given that other sections of the Affidavit revealed that over the 4 year investigation SBSD had evidence that Williams had traveled to the Caribbean once and that Williams had a home in Switzerland. | Aff't at 13-14, 47 |
| 151b | "Paying for goods and services with cash to avoid placing monies in the banking system" is a "key indicator" of Williams' money laundering activity. | Aff't at 55. | The only evidence of Williams paying with cash was Andalon's statement that she and other employees of Williams had been paid in cash.  Williams contends that this was misleading, because the Affidavit never revealed that Andalon was Williams' housekeeper and there is nothing particularly unusual about paying such an employee in cash.  In any event, Williams paid Andalon in cash because she did not have a bank account. | Aff't at 11; Reply Exh. MM (Williams Depo.) at 68:25 to 69:21 |

| FA No. (see Mot. Exh. F) | Fact Reported in Aff't | Support | Williams's Version | Support |
|---|---|---|---|---|
| | | | **Narcotics** | |
| 7 | "Your affiant's investigations revealed that Williams has been associated with illegal narcotics." | Aff't at 4 | Sheriff Thomas testified in deposition that "I don't think we ever established narcotics trafficking." He also acknowledged that Defendants never had any evidence that any narcotics were visually observed, nor that any narcotics transaction was ever observed. | Opp. Exh. D (Thomas Depo.) at 34:23 to 35:23. |
| 24 | Andalon "has never given your affiant any false or misleading information." **Additional Information** Andalon has proved a reliable informant in the past. Palera declares that Andalon has assisted SBSD on at least 25 cases and that she had not provided information | Aff't at 9. Motion (Palera Decl.) ¶¶ 1, 2, 6. | Williams contends that "no reasonable officer would assert that," given some of Andalon's more curious observations: (1) that $600,000 to $2.2 million in 1930s currency was mixed with magazines and other papers in a garbage bag in Williams' garage, and that Williams had a practice of paying his employees with that vintage cash which was worth more than its face value. (2) that she observed an act of bestiality. (3) that the alleged mastermind of a global money laundering conspiracy had asked his housekeeper about obtaining fictitious Mexican passports. | Aff't at 10-11 Andalon Depo. at 207:23-209:11; Aff't at 16. |

| FA No. (see Mot. Exh. F) | Fact Reported in Aff't | Support | Williams's Version | Support |
|---|---|---|---|---|
| 24 (cont'd) | in the past that turned out to be false or unreliable. At least 12 of the cases for which Andalon provided information involved "multiple kilo or pound size" cocaine or methamphetamine. Two cases involved suspects performing both narcotic activity and money laundering. | | | |
| 43 | Andalon noticed "a very strong chemical odor, consistent with that of methamphetamine, coming from the closet in Williams' bedroom." | Aff't at 11 | Williams argues that this contention is misleading in that it is undated. It appears Andalon reported this occurrence to detective Birchim on March 25, 1998. | Opp. Exh. Q at 320; Reply Exh. WW (Birchim Depo.) at 23-25. |

A - 7

| FA No. (see Mot. Exh. F) | Fact Reported in Aff't | Support | Williams's Version | Support |
|---|---|---|---|---|
| 48 | "In June of 1998, [Andalon] noticed Paul with a duffel bag, which had a strong chemical odor coming from the bag. The chemical odor was consistent with the odor associated with methamphetamine." | Aff't at 12. | The June 29, 1998 notes from Hernreck's meeting with Andalon stated that Andalon had noticed an odor emanating from Paul's bag, but that it was "unknown if it was drugs." | Opp. Exh. K at 287. |
| 50 | "Although [Andalon] could not see the contents of [Paul's] bag, [she] concluded by the size and shape of the bag was consistent with the size and shape of large amounts of currency." | Aff't at 12 | Williams argues that it was misleading to report this observation, given that a bag suitable for "large amounts of currency" is also suitable for a great many other things. | |

| FA No. (see Mot. Exh. F) | Fact Reported in Aff't | Support | Williams's Version | Support |
|---|---|---|---|---|
| 56 | "On numerous occasions for the several months [before January 11, 2000] three women from Arizona have been coming to Williams' residence delivering similar type nylon bags." | Aff't at 12 | Andalon's account of the three women from Arizona was reported on December 15, 1998 – over a year before January 2000.<br><br>Despite "hundreds of hours" of purported surveillance of Williams' activities, Aff't at 24, only one report regarding a car with Arizona plates ("JUSDOIT") appears in the record submitted by Defendants in support of their motion. The Arizona car was spotted on or about December 3, 1999. | Opp. Exh. AA.<br><br>Reply Exh. DDD. |
| 65 | "[Andalon] told your affiant that [she] has seen Williams with a white powder under his nose." | Aff't at 13 | This allegation is irrelevant to allegations regarding methamphetamine. *Hervey v. Estes*, 65 F.3d 784, 790 (9th Cir. 1995). | |

| FA No. (see Mot. Exh. F) | Fact Reported in Aff't | Support | Williams's Version | Support |
|---|---|---|---|---|
| 98 | Andalon told Means that she "noticed the strong odor of chemical coming from Williams' locked closet again on Friday, October 22, 1999." | Aff't at 17 | Means has stated that when Andalon told him about this occurrence, he "tri[ed] to get her to describe what the odor was, consistent with, smelled like." Means stated that Andalon did not mention methamphetamine at that time. Williams argues that this makes FA No. 98 misleading in light of FA No. 43. By referring to "the" strong odor coming from the closet "again," this misleadingly implies that Andalon had identified the smell as consistent with methamphetamine as she did in 1998. | Opp. Exh. B at 389:16 to 390:16. |

A - 10

# APPENDIX B
## SELECTED FACTS OMITTED FROM MEANS AFFIDAVIT

| No. | Omitted Fact | Support |
|-----|--------------|---------|
| | **Money Laundering and Williams's Finances** | |
| 1. | Chinn believed he had insufficient information to make a determination regarding whether Williams was involved in money laundering. He has stated that he could not even arrive at a "tentative or provisional" determination concerning money laundering in this case. He told Means that he could not render an opinion on money laundering.<br><br>Brenton Chinn is an investigative auditor for the California Department of Justice with expertise in financial analysis in support of narcotics investigations. He was one of the individuals retained by SBSD to analyze the financial data in this case. Chinn's Answer to Third Am. Compl. ¶¶ 12, 14-15; Aff't at 4. | Opp. Exh. E (Chinn Depo.) at 41:21 to 42:15; 78:8-15 |
| 2. | Chinn had insufficient information to do a meaningful "net worth" analysis on Williams. | Opp. Exh. E (Chinn Depo.) at 77:6 to 78:7. |

| No. | Omitted Fact | Support |
|---|---|---|
| 3. | Chinn stated that the dearth of information available to the SBSD meant that any "source and application" analysis "wouldn't lead to any kind of conclusion."<br><br>In particular, Chinn stated that he told Means that the analysis "wasn't complete," because SBSD did not know what Williams' assets were at the outset of the time period examined and what income was being generated by the brokerage accounts which SBSD knew he had. | Opp. Exh. E (Chinn Depo.) at 78:19 to 80:2. |
|  | An entire section of the Affidavit (Section V), constituting 18 out of 57 pages, contained a detailed "source and application" analysis of Williams' finances.  This analysis served as a backbone for Means' contention that Williams had spent about $2.2 million more over a five year period than could be accounted for by reference to legitimate income.  Aff't at 48-49 ("Based on the information discovered by your affiant . . . your affiant can show that Williams has an unaccounted for income of $2,223,313.").<br><br>The only qualifier in this entire section was Means' statement that "Your affiant's time line analysis is not a complete reconstruction of Williams' financial status due to the lack of documentation." *Id.* at 48. | *Id.* at 80:3 to 81:25 |

| No. | Omitted Fact | Support |
|---|---|---|
| 4. | In tracking Williams' finances (and ultimately concluding that about $2.2 million was unaccounted for), Means noted a wire transfer of $1,040,000 from Williams' account to an unidentified Pictet and Cie account in Switzerland. From Williams' financial statement, Means knew that Williams had a Pictet and Cie account. Means treated the $1.04 million as an "application" (money expended). He did not inform the Magistrate that there was a possibility that Williams had transferred the money to his own Pictet account in Switzerland, despite Williams' demonstrated propensity for transferring money between his various accounts.

Means contends that he did not know at the time that the Pictet account belonged to Williams. He argues that he was therefore justified in treating that transaction as an "application" because the documents showed him transferring money from a known account to an unknown account. | Aff't at 43; Motion Vol II Tab 17 at 325 (Williams Financial Statement).

Opp. Exh. B (Means Depo.) at 449:21 to 450:22. |

| No. | Omitted Fact | Support |
|-----|--------------|---------|
| | **Narcotics** | |
| 5. | Means characterized the 1930s currency Andalon found as "suspicious," Aff't at 11, and did not state that Means' "theory of where the cash came from" was that it was a currency collection passed down from Williams' parents. | Opp. Exh. B at 92:3-17 |
| 6. | Means failed to advise that several searches on criminal databases showed that none of the principal targets of the investigation – including Williams – had any criminal record, other than traffic violations. Plaintiffs say this is significant, given the charge that Williams was running a worldwide money laundering operation. | Motion, Means Decl. ¶ 48. |
| | Means argues that this information was not relevant, because no reported criminal history does not mean that crime is not occurring. | Motion, Means Decl. ¶ 48 |

B - 4

| No. | Omitted Fact | Support |
|---|---|---|
| 7. | Andalon reported the purported details of overheard conversations and several statements attributed to Williams were reported in the Affidavit. (*E.g.* "Don't worry about an investigation. If they can't find the money, then there is no evidence. Without evidence there is no case."")<br><br>However, Means omitted that Andalon, a graduate of eighth grade in Mexico, had limited English proficiency. In fact, Means has stated that Andalon "would speak to [him] through Hermrick," because Means was not able to understand her "broken English." *See also* Motion Exh. Y (Olmstead Depo.) at 16:5-9 (Q: Was Andalon able to communicate with you in English effectively? A: Broken English Q: But you got your thoughts across? A: Not every time."") | Aff't at 16<br><br>Opp. Exh. C (Andalon Depo.) at 101:14 to 102:7; Reply Exh. YY at 75:6-15 |
| 8. | Andalon reported that "[o]n several occasions, Schade has met Williams at the residence and assisted him in loading suspicious packages. . . . On one occasion . . . Schade loaded a heavy ice chest" onto his vehicle and would not allow Andalon to touch the chest. Means omitted that Schade loaded the ice chest on the morning after Williams hosted a party to celebrate Dale and Lea Schade's anniversary. The ice chest had been delivered to the house on the day before the anniversary party. | Aff't at 15.<br><br>Opp. Exh. R (report of interview with Andalon) at 328. |

| No. | Omitted Fact | Support |
|---|---|---|
| 9. | The Affidavit made it appear that Andalon was at the Williams residence on a constant basis. Means failed to indicate that Andalon was at the residence for only a half hour each day Mondays through Thursdays, about four hours on Fridays, and "on occasion" on weekends to help with a party or social function. | Opp. (Williams Decl.) ¶ 4. |
| 10. | The Affidavit presented Williams's relationship with Dale Schade (a Lieutenant at SBSD, Aff't at 7) as somewhat sinister. Schade apparently delivered "suspicious packages" to Williams regularly and Andalon believed that "Schade would protect Williams from other Deputies in the Santa Ynez Valley." | *E.g.* Aff't at 15. |
| | Means omitted that Williams and Schade's friendship and business relationship was very public in the SBSD. Dorsey (an Under-Sheriff) testified that he knew that Schade was doing appraisal work for Williams on the side. And when Williams held a party for Lia and Dale Schade at his house, "most of the [SBSD] had been invited." | Opp. Exh. T (Dorsey Depo.) at 22:14 to 23:10. Opp. Exh. V (Shenwell Depo) at 48:17-21. |

B - 6

## APPENDIX C

## ITEMS DISCOVERED BY ANDALON THAT SHE READ OR REMOVED;
## CONVERSATIONS ANDALON OVERHEARD

| ITEM/CONVERSATION | READ OR REMOVED? |
|---|---|
| 1930s Currency | • Andalon claims to have discovered stacks of unusual currency 12" wide, 12" tall, 24" long in a garbage bag mixed with other trash in Williams's garage. Aff't at 10-11.<br><br>• Based on the dimensions reported by Andalon, Means and banking experts estimated that the total amount of money in the stacks was between $640,000 and $3,840,000. Aff't at 52. Means also believed the currency was worth more than face value of notes. Aff't at 11.<br><br>• Andalon claims she was paid using this currency. She provided some of that currency to detectives. Aff't at 11.<br><br>• Williams contends that his 1930s currency collection was given to him by his father, that he did not believe the face value of all the currency exceeded $10,000, and that he kept the collection in his bedroom closet. Williams denies ever paying his employees with money from this collection. If Andalon obtained any of that currency, he maintains, she stole it from him. Opp. (Williams Decl.) ¶ 12. |
| Williams's Passport | • Andalon **removed** the passport and gave it to an SBSD detective. She did this unsolicited. The detective photocopied it and instructed her to return it. Opp. Exh. B (Means Depo.) at 145:11 to 146:12.<br><br>• This occurred prior to Means' involvement in the case. *Id.* After Andalon did this, she was instructed not to take any more of Williams' personal property from the house, "other than trash." *Id.* at 146:22 to147:9.<br><br>• Andalon says she doesn't remember taking any passport. Motion Exh. I (Andalon Depo.) at 106:13-21. |

| ITEM/CONVERSATION | READ OR REMOVED? |
|---|---|
| Unspecified "trash" (presumably paper trash) | • Andalon **removed** trash from the Williams premises over the course of the investigation. SBSD detectives did not discard the items. Rather, they sealed them in manilla envelopes and catalogued them. Opp. Exh. B (Means Depo.) at 145:6-10, 149:4 to 150:6.<br>• Andalon was instructed not to take trash from the Williams house on or about January 6, 1999. Reply SGI ¶ 240. |
| Two microcassette tapes apparently from Williams' answering machine | • **Removed.** Opp. Exh. B (Means Depo.) at 147:10 to 148:7.<br>• Andalon says she removed the tapes from the trash. Reply Exh. QQ at 228:12-15. |
| Andalon read "papers, trash or magazines" left lying around the house. | • **Read.** In the process of cleaning shelves, drawers, etc., Andalon had to move those papers. In the course of doing so she read them and reported the contents of "suspicious" ones to Hermreck. Motion Exh. I (Andalon Depo.) at 106:22 to 108:1. |
| Envelope containing a check to Dale Schade | • Andalon **held the envelope up to the light** to see what was inside. She reported this to Means. Opp. Exh. B at 157:16-22 (Means Depo.). |
| General allegation that Andalon went "out of her way" to overhear conversations | N/A |